IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| **ETHAN CARL DICK** | § § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § § | **CIVIL ACTION NO.** |
| **GALVESTON COUNTY, TEXAS;** | § | **3:26-cv-00201** |
| **SHERIFF JIMMY FULLEN,** in his | § | |
| official capacity; **DEPUTY A.P.** | § | |
| **SAVAGE,** in his individual capacity; | § | |
| **DEPUTY K.D. CAGNON,** in his | § | |
| individual capacity; **DEPUTY A.J.** | § | |
| **MEJIA,** in his individual capacity; | § | |
| and **CORPORAL J. CRUZ,** in his | § | |
| individual capacity, | § § | |
| **Defendants.** | § | |

---

**PLAINTIFF'S ORIGINAL COMPLAINT**
**(Jury Trial Demanded)**

---

**COMES NOW Plaintiff Ethan Carl Dick**, by and through his counsel, **Attorney Courtney A. Vincent of Vincent Civil Rights – a Division of Vincent Law, PLLC**, and **Attorney Adalberto E. Ruiz of the Ruiz Law Firm, PLLC**, and files this _Original Complaint_ asserting that **Defendants Galveston County, Texas, Sheriff Jimmy Fullen, Deputy A.P. Savage, Deputy K.D. Cagnon, Deputy A.J. Mejia**, and **Corporal J. Cruz**, and respectfully shows the Court as follows:

## I. <u>INTRODUCTION</u>

This case begins with a simple request.  As Jeremy Harrison was being placed under

arrest by Galveston County Sheriff's deputies on May 4, 2025, he saw his coworker Ethan Dick approaching and asked Deputy Cagnon: "Can you give my wallet to him?" Cagnon answered: "Yeah." Harrison then called out: "Hey come here Ethan." Cagnon called out: "Stay over there and I'll bring it to you." Twenty-four seconds later, Ethan Dick was face-down on a concrete driveway with broken teeth, a concussion, and a hole in his lip requiring stitches. He never touched an officer. He never threatened anyone. He never reached for a weapon. His last word before being driven face-first into concrete was "Alright."

In the intervening twenty-four seconds, Dick said "Hey fuck you man" – a constitutionally protected expression of frustration under the First Amendment, *Houston v. Hill*, 482 U.S. 451, 461 (1987) – directed at an officer who had just acknowledged his innocent purpose moments before. That single phrase, captured on three body-worn cameras, appears to have been the only event that transformed a wallet retrieval into a use-of-force incident. Nothing else changed. No weapon appeared. No physical threat was made. No crime occurred. The deputies simply decided that "fuck you" warranted a body slam.

While Plaintiff's arms were physically restrained behind his back by two deputies simultaneously, a third deputy lifted Plaintiff with such violent upward force that his feet rose above his own head height, then drove him face-first into a concrete driveway. At the precise moment Plaintiff was lifted, he had audibly said "Alright" in direct response to compliance commands – commands that Plaintiff was physically incapable of obeying because the officers issuing them were simultaneously restraining his arms. Plaintiff struck the concrete face-first, unable to break his fall. While he lay prone, bleeding, and

restrained, a deputy struck him twice in the face with closed fists. The officer who delivered those strikes later documented them in an official report, describing them as having produced "positive results."

Plaintiff was unarmed. He had committed no crime. He had made no threats. The force used against Plaintiff was excessive, objectively unreasonable, and disproportionate to any perceived resistance or threat.

As a direct result of Defendants' conduct, Plaintiff suffered significant injuries including broken teeth, a concussion, facial trauma, a sprained wrist, a sprained shoulder, and a lacerated lip requiring stitches.

## II.   NATURE OF THE ACTION

1. This is a civil rights action brought pursuant to 42 U.S.C. §1983 to redress violations of Plaintiff's rights secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution, by law enforcement officers acting under color of state law.

2. The conduct of the individual Defendants violated clearly established constitutional rights.

3. These violations occurred pursuant to the customs, policies, practices, ratification, and deliberate indifference of Galveston County and its Sheriff, who serves as the final policymaker for law enforcement operations of the Galveston County Sheriff's Office.

## III.   JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343 because this

action arises under the Constitution and laws of the United States.

5. This Court has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. §1367.

6. Venue is proper in the Southern District of Texas, Galveston Division, pursuant to 28 U.S.C. §1391(b) because the events giving rise to this action occurred in Galveston County, Texas.

## IV.    PARTIES

7. Plaintiff **Ethan Carl Dick** is an individual and citizen of the United States who resides in the State of Louisiana and may be served wherever he may be found.

8. Defendant **Galveston County, Texas** is a political subdivision of the State of Texas responsible for the policies, customs, practices, supervision, discipline, and training of the Galveston County Sheriff's Office and its deputies.  Galveston County may be served through the Galveston County Judge, 722 Moody Avenue, Galveston, Texas 77550, or wherever they may be found.

9. Defendant **Sheriff Jimmy Fullen** is the duly elected Sheriff of Galveston County, Texas and the ***final policymaker*** for law enforcement operations of the Galveston County Sheriff's Office.  Sheriff Fullen is sued in his official capacity.  He may be served at the Galveston County Sheriff's Office, 601 54th Street, Galveston, Texas 77551, or wherever he may be found.

10. Defendant **Deputy A.P. Savage** was at all relevant times a peace officer employed by the Galveston County Sheriff's Office.  Savage was acting under color of state law while performing official law enforcement duties and within the course and

scope of his employment at all times relevant to this lawsuit. Savage is sued in his individual capacity and may be served at his place of employment or wherever he may be found.

11. Defendant **Deputy K.D. Cagnon** was at all relevant times a peace officer employed by the Galveston County Sheriff's Office. Cagnon was acting under color of state law while performing official law enforcement duties and within the course and scope of his employment at all times relevant to this lawsuit. Cagnon is sued in his individual capacity and may be served at his place of employment or wherever he may be found.

12. Defendant **Deputy A.J. Mejia** was at all relevant times a peace officer employed by the Galveston County Sheriff's Office. Mejia was acting under color of state law while performing official law enforcement duties and within the course and scope of his employment at all times relevant to this lawsuit. Mejia is sued in his individual capacity and may be served at his place of employment or wherever he may be found.

13. Defendant **Corporal J. Cruz** was at all relevant times a supervisory peace officer employed by the Galveston County Sheriff's Office. Cruz was acting under color of state law while performing official law enforcement duties and within the course and scope of his employment at all times relevant to this lawsuit. Cruz is sued in his individual capacity and may be served at his place of employment or wherever he may be found.

## V. FACTUAL ALLEGATIONS

14. On May 4, 2025, deputies of the Galveston County Sheriff's Office responded to a reported disturbance at an RV park located at 675 Miles Road in Bacliff, Texas. Deputies present at the scene included Corporal Cruz, Deputy Savage, Deputy Mejia, and Deputy Cagnon.

15. Plaintiff Ethan Carl Dick was inside his camper at the Kemah RV Park when his coworker Jeremy Harrison – who was being arrested by the deputies on scene – called out to Plaintiff and asked him to retrieve Harrison's wallet. Plaintiff walked from his camper toward the deputies and approached the patrol units.

16. Plaintiff was unarmed and did not pose a threat to the deputies or others present. Plaintiff did not attempt to flee. Plaintiff did not display a weapon or engage in any threatening conduct. Plaintiff did not make any threats toward officers.

### *The Approach, the Wallet, and the Pre-Force*

17. Before the first compliance command was issued, Deputy Cagnon had already identified the peaceful resolution to Plaintiff's approach. As Plaintiff moved toward the patrol units, Harrison – who was being loaded into the cruiser – asked Cagnon: "Can you give my wallet to him?" Cagnon answered: "Yeah." Harrison then called out: "Hey come here Ethan." Cagnon called out: "Stay over there and I'll bring it to you." This exchange shows that the deputies understood Plaintiff's purpose was the innocent retrieval of his coworker's personal property before any compliance command was issued. The deputies acknowledged his innocent purpose. They agreed to facilitate the transfer.

18. Despite this acknowledged innocent purpose, Defendant Savage instructed Plaintiff multiple times to remain back. Plaintiff – who had been called over by his boss, whose wallet transfer Cagnon had just agreed to facilitate – expressed frustration verbally. In direct response to being told to stay back when he knew his purpose was innocent, Plaintiff stated: "Hey fuck you man." This expression, however offensive, constitutes constitutionally protected speech directed at a law enforcement officer. The fighting-words exception does not apply to verbal criticism directed at law enforcement officers, who are trained and constitutionally required to exercise restraint in response to verbal provocation. Harrison, observing the interaction from the cruiser, called out to Plaintiff: "Hey don't get in no trouble."

19. Plaintiff continued forward and asked his coworker why he was being arrested – bystander speech directed at a third party, not at any officer. Savage again ordered Plaintiff to back up. Plaintiff responded: "No I ain't done shit" – a verbal assertion of his innocence, constitutionally protected under the First Amendment. Savage then ordered Plaintiff to put his hands behind his back. Plaintiff responded: "No I was just askin' man" – a verbal explanation of his innocent purpose, also constitutionally protected.

20. At no point during this exchange did Plaintiff make a physical threat, reach toward any officer, attempt to strike anyone, or make any aggressive physical movement toward any officer. He did not display or reference a weapon. His non-compliance was verbal and positional – he contested the officers' characterization of his conduct in words, not in physical action. His protected speech was the direct and only

apparent trigger for the escalation that followed.

21.   From Deputy Savage's first command – "Stay over there" – to the moment Plaintiff struck the concrete driveway, approximately twenty-four (24) seconds elapsed.

22.   Within that span, Plaintiff exchanged words with the deputies, asked his coworker a question, verbally declined commands, had both arms physically restrained by two deputies simultaneously, heard a compliance command that was physically impossible to obey, said "Alright," and was driven face-first into concrete with sufficient force to raise his feet above his head height.

23.   No weapon appeared during those twenty-four seconds. No physical threat was made.

### The Force Sequence

24.   The following sequence is reflected in Defendants' own official reports. From Defendant Cagnon's command "We told you to move" to the moment Plaintiff struck the concrete driveway, only nine (9) seconds elapsed.

25.   Within seconds of Plaintiff's verbal responses, Defendants Savage and Cagnon physically restrained Plaintiff's arms – Cagnon holding Plaintiff's right arm and Savage holding Plaintiff's left arm, both behind his back.  At this moment, physical control of Plaintiff had been established.  Both Savage and Cagnon simultaneously restrained Plaintiff's arms behind his back while issuing commands to "put your fucking hands behind your back" – commands that were physically impossible to comply with because both deputies were simultaneously restraining Plaintiff's arms.

26.   As Defendant Mejia approached the scene, Defendant Cagnon was holding

Plaintiff's right arm behind his back and Defendant Savage was holding Plaintiff's left arm behind his back, in Mejia's direct line of sight. Mejia nonetheless called out: 'Put your fuckin' hands behind your back, stop resisting or I'm gonna tase you, I'm gonna fuckin' tase you' – commands that were physically impossible for Plaintiff to obey because his arms were already restrained by two other deputies.

27. In direct response to Mejia's commands, Plaintiff stated: "I was just askin' man" – a verbal explanation of his innocent purpose. Plaintiff had not made any threat, had not raised his voice aggressively, and had not made any threatening physical movement.

28. Plaintiff then stated: "Alright" – at the moment Plaintiff said "Alright," his feet were on the ground.

29. At the moment Plaintiff said "Alright," Defendant Savage had already transitioned his grip – moving from holding Plaintiff's left arm behind his back to wrapping his arms around Plaintiff's torso from behind. This transition from arm restraint to body wrap constituted a deliberate escalation from control to takedown, initiated at a moment when Plaintiff was standing, his arms were controlled, and no new act of resistance or threatening conduct had occurred.

30. Approximately one second after Plaintiff's audible compliance, with Plaintiff's feet still on the ground, Defendant Savage lifted Plaintiff completely off the ground with such violent upward force that Plaintiff's feet rose above his own head height, then drove Plaintiff face-first into the concrete driveway. The completion of this body slam occurred with Defendant Savage's full awareness of Plaintiff's audible

compliance.   Because Defendants Savage, Cagnon, and Mejia were controlling Plaintiff's body and his arms were pinned, Plaintiff was physically incapable of breaking his fall, and he struck the concrete face-first.  The entire sequence – from Defendant Mejia's first command to Plaintiff striking the concrete – elapsed in four seconds.

31.    Defendant Mejia, who was issuing verbal commands throughout this four-second sequence and was physically proximate to the unfolding force, had a reasonable opportunity to intervene – including by directing verbal commands to Defendants Savage and Cagnon rather than to Plaintiff – but failed to do so.  Mejia had the opportunity to issue verbal commands directing his fellow officers to stop, demonstrating that verbal intervention was available and feasible.

32.    While Plaintiff lay prone on the ground – face down, bleeding, with his hands restrained – Defendant Cagnon delivered two closed-fist punches to Plaintiff's face. Defendant Cagnon's own official supplement report, filed May 7, 2025, acknowledges delivering "two closed fist strikes to Ethan's face" after Plaintiff had been "taken to the ground," describing the strikes as having produced "positive results" – compliance framing that reveals the strikes were not defensive force but a technique applied to a person already on the ground, under control, and incapable of resistance.

33.    After Plaintiff was prone and injured, Defendant Mejia assisted in handcuffing Plaintiff.  The blows were delivered after Plaintiff had already been forced to the ground and while he remained under physical restraint.  The force used against

Plaintiff was excessive and unnecessary under the circumstances.

34.    As a direct result of this conduct, Plaintiff sustained severe injuries including broken teeth, a concussion, facial trauma, a sprained wrist, a sprained shoulder, and a lacerated lip requiring stitches.  Plaintiff continues to suffer pain, medical expenses, and emotional distress.

35.    Emergency medical services (EMS) were called to the scene.  Plaintiff verbally declined EMS treatment at the scene.  However, at the time of that refusal, Plaintiff had just sustained significant head trauma, was bleeding profusely from his face, had a visible hole in his lip, and there was a pool of blood on the concrete driveway where he had been slammed.  Plaintiff was in no condition – medically, neurologically, or cognitively – to meaningfully evaluate or assess whether he required emergency medical treatment.  A refusal of treatment under these circumstances does not diminish the objective severity of Plaintiff's injuries or GCSO's responsibility for the medical consequences of the force applied.

### *Arrest and Charges*

36.    Plaintiff was charged with "Interfering with Public Duties" and "Resisting Arrest, Search, or Transport."  Plaintiff was transported to the Galveston County Jail. Plaintiff was required to appear before a magistrate and post bond.

### *Video Evidence and Spoliation*

37.    Deputies present at the scene were equipped with body-worn cameras and in-car dash cameras.  These devices were capable of recording the interaction between Plaintiff and the deputies.  The complete pre-force sequence – including Harrison's

wallet request, Cagnon's "Yeah," Harrison calling Dick over, Plaintiff's "Hey fuck you man," Harrison's "Don't get in no trouble," and the full force sequence – is captured on three body-worn cameras.

38. Upon information and belief, the video evidence produced by the State is incomplete and does not capture the complete force sequence. The dash camera recording of Deputy Mejia begins only after the initial use of force had already occurred. Specifically, the missing dash camera footage belongs to Deputy Andrew Mejia (Unit 3215; internal file designation: AndrewMejia_202505050315_3215-0). Deputy Mejia's dash camera recording begins at a zero timestamp and lacks the standard Motorola header or branding present on all other GCSO dash camera recordings produced in this matter. Moreover, all four deputies on scene – Savage, Cagnon, Mejia, and Cruz – appear in the frame at timestamp 0:00:00 of Mejia's recording, which is physically impossible if the camera activated naturally at that moment.

39. Deputy Mejia's cruiser was positioned such that its wide-angle front-facing camera would have captured the complete force sequence – including the compliance commands, Plaintiff's audible "Alright," Plaintiff's feet on the ground, the initiation of the body wrap, the violent lift to above-head-height, the face-first slam onto concrete, and the closed-fist strikes – had it recorded from the beginning of the encounter. The anomalous condition of this specific recording – the zero timestamp, the missing Motorola header, and the physical impossibility of all four officers appearing in frame at 0:00:00 – is consistent with the deliberate alteration or

replacement of footage that would have been directly exculpatory of Plaintiff and directly inculpatory of the officers involved.  Defendants had a duty to preserve this evidence.  The destruction, loss, or failure to preserve this evidence supports an inference of spoliation and warrants appropriate sanctions, including an adverse inference instruction at trial.

40.    Supervisory personnel within the Galveston County Sheriff's Office reviewed the incident after it occurred through internal reporting and review procedures.  Despite Plaintiff's injuries and the circumstances surrounding the use of force, the deputies' conduct was approved through internal reporting procedures and supervisory review within the Galveston County Sheriff's Office.

41.    Any resistance alleged by Defendants occurred, if at all, prior to the use of force described herein.  The force used by Defendants occurred after Plaintiff had been physically restrained and was no longer posing a threat to officers.

### Nolo Contendere Plea and Heck v. Humphrey

42.    On October 24, 2025, Plaintiff entered a plea of nolo contendere to Resisting Arrest, Search, or Transport under Tex. Penal Code §38.03(a) – a Class A Misdemeanor – in Cause No. MD-0424114, County Court at Law No. 3, Galveston County, Texas (Judge Jack Ewing), and was sentenced to four days county jail with two days credit, time served.  Plaintiff's nolo contendere plea did not constitute an admission of the underlying facts and does not specify the timing, sequence, or nature of any conduct alleged to constitute the offense.

43.    Plaintiff's §1983 excessive force claims herein are not barred by *Heck v. Humphrey*,

512 U.S. 477 (1994), because success on those claims would not necessarily imply the invalidity of Plaintiff's conviction.

44. The encounter divides into three distinct phases. Phase One – Plaintiff's verbal refusals and positional non-compliance during initial contact – may constitute the factual predicate for the §38.03 conviction. Plaintiff does not seek a finding inconsistent with that conviction. Phase Two begins at the moment Savage and Cagnon established bilateral physical control of Plaintiff's arms. This is the Heck firewall. Phase Three – the body slam and prone closed-fist strikes – is the constitutional violation. Plaintiff's arms already restrained behind his back before Defendant Savage lifted him and before Defendant Cagnon delivered closed-fist strikes to Plaintiff's face. The excessive force described herein occurred after Plaintiff had been physically subdued and was no longer capable of resistance – temporally and factually distinct from any conduct underlying the §38.03 conviction. Moreover, Defendant Cagnon's own official supplement report – filed May 7, 2025, and reviewed and approved by Defendant Cruz on May 7, 2025 at 11:34 p.m. – acknowledges that the closed-fist strikes were delivered after Plaintiff had been "taken to the ground," confirming that the challenged force occurred post-subdual.

## VI.   CLEARLY ESTABLISHED LAW

45. Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

46. A jury may simultaneously find that Plaintiff engaged in some act of resistance at

some point during the encounter and that the force applied after he was restrained was unconstitutionally excessive. These findings are not mutually exclusive. The Supreme Court has made clear that courts evaluating excessive force claims cannot apply "chronological blinders" and must assess the totality of the circumstances across the full temporal arc of the encounter. *Barnes v. Felix*, 605 U.S. 73 (2025).

47. The law governing the use of force during arrests has long been clearly established under the Fourth Amendment. Under *Graham v. Connor*, 490 U.S. 386 (1989), law enforcement officers may only use that amount of force that is objectively reasonable under the totality of the circumstances. The three *Graham* factors – severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is actively resisting or fleeing – all weigh decisively in Plaintiff's favor. Plaintiff had committed no crime; the officers knew it, having just agreed to facilitate his wallet retrieval. He posed no threat. His last audible acts before force was applied were a verbal explanation of innocent conduct and a word of compliance. *Barnes v. Felix,* 605 U.S. 73 (2025), holds that the totality-of-the-circumstances inquiry "has no time limit" and that a court "cannot review the totality of the circumstances if it has put on chronological blinders." The complete encounter here lasted twenty-four seconds; it contained no physical threat, no weapon, and no conduct that justified a body slam.

48. The Fifth Circuit has held that slamming, striking, or otherwise using gratuitous force against a restrained or subdued suspect constitutes excessive force in violation of the Fourth Amendment. In *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009),

the Fifth Circuit held that the use of disproportionate force against minimal resistance violates clearly established constitutional law. In *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995), the Fifth Circuit held that an officer who is present at the scene, observes excessive force, and has a reasonable opportunity to prevent the harm but fails to act may be held liable under 42 U.S.C. §1983.

49. The Southern District of Texas has applied these principles directly in cases with comparable facts. In *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 833 (S.D. Tex. 2011), this Court denied a motion to dismiss an excessive force claim where the plaintiff alleged that an officer threw him off a porch and then kicked him in the shoulders, back, and head after he was handcuffed and face down on the ground. The factual parallel to this case – force applied to a prone, restrained plaintiff who posed no ongoing threat – is direct.

50. Any reasonable officer would have known that: (1) lifting a verbally compliant, physically controlled, unarmed individual with sufficient force to raise his feet above his head height and driving him face-first onto concrete was unlawful; (2) delivering closed-fist strikes to a prone, restrained, and incapacitated individual was unlawful; (3) issuing compliance commands to a person whose arms are being physically restrained by fellow officers, then treating the resulting inability to comply as resistance justifying force, was unlawful; and (4) witnessing these acts while in a position to intervene and failing to do so was unlawful. The conduct of Defendants falls squarely within the conduct prohibited by clearly established law as of May 4, 2025.

## VII.    CONSTITUTIONAL RIGHTS VIOLATED

51.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

52.    The conduct of Defendants described above deprived Plaintiff of rights secured by the Constitution of the United States, including rights under the First, Fourth, and Fourteenth Amendments.

53.    Defendants' actions violated Plaintiff's rights under the Fourth Amendment to the United States Constitution, including the right to be free from unreasonable seizures and the use of excessive force by law enforcement officers during an arrest or detention.

54.    The force sequence presents two independently unconstitutional decision points. First: Defendant Savage's decision to escalate from arm restraint to a body-wrap takedown, initiated while Plaintiff was standing, controlled, and had not engaged in any new act of resistance – an escalation for which no objectively reasonable justification existed.  Second: Defendant Savage's completion of a full-force body slam onto concrete after hearing Plaintiff audibly comply – a moment at which any reasonable officer would have modulated or ceased the force.  Either decision point independently establishes excessive force under the Fourth Amendment.

55.    Defendants' actions independently violated Plaintiff's rights under the First Amendment to the United States Constitution.  The First Amendment protects the right of individuals to engage in verbal criticism of law enforcement officers, including the use of profanity directed at officers, without suffering physical

retaliation. *Houston v. Hill*, 482 U.S. 451, 461 (1987). Plaintiff's verbal expression – "Hey fuck you man" – directed at Defendant Savage while Plaintiff was approaching for the acknowledged innocent purpose of retrieving his coworker's wallet constituted protected speech under the First Amendment. The fighting-words exception does not apply to verbal criticism directed at law enforcement officers, who are trained and constitutionally required to exercise greater restraint in response to verbal provocation than private citizens. *Id.* The undisputed sequence of events shows that this protected expression was the direct and proximate trigger for Defendants' immediate physical escalation. Defendants Savage and Cagnon used physical force against Plaintiff in direct retaliation for his exercise of First Amendment rights, in violation of 42 U.S.C. §1983. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

56.   As a pretrial detainee, Plaintiff's right to adequate medical care is protected by the Fourteenth Amendment's Due Process Clause, as set forth in Claim Five below. The Fourth Amendment – made applicable to the states through the Fourteenth Amendment – is the exclusive constitutional basis for the excessive force claims set forth herein, consistent with *Graham v. Connor*, 490 U.S. 386 (1989).

57.   At all times relevant to this action, Defendants were acting under color of state law within the course and scope of their employment as law enforcement officers for the Galveston County Sheriff's Office. The rights violated were clearly established at the time of the events described herein.

58.

## VIII.  MUNICIPAL CUSTOM, POLICY, RATIFICATION, AND DELIBERATE INDIFFERENCE (Monell Liability)

59.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

60.    Defendant Sheriff Jimmy Fullen is the duly elected Sheriff of Galveston County, Texas, and serves as the final policymaker for law enforcement operations of the Galveston County Sheriff's Office under Texas law.

61.    Galveston County is liable under 42 U.S.C. §1983 because the constitutional violations suffered by Plaintiff were caused by official policies, customs, practices, and decisions of its final policymaker, as well as by its deliberate indifference to known and recurring constitutional violations. *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (establishing the three-elements Monell test: (1) official policy or custom; (2) attributable to the municipality's final policymaker; (3) that was the moving force behind the constitutional violation).

*Pattern of Similar Constitutional Violations*

62.    Prior to the incident making the basis of this lawsuit, Galveston County, through its Sheriff's Office, had actual or constructive knowledge of a pattern of materially similar constitutional violations involving: (1) the use of force against restrained or subdued individuals; (2) the use of force against non-resisting or minimally resisting civilians; and (3) the use of force followed by incomplete, inaccurate, or contradicted reporting, including incidents where video evidence undermined

official accounts.

63. The prior incidents described in this Complaint share a common constitutional signature with the incident at issue: force applied after control had been established or in the absence of a legitimate threat, often accompanied by failures in reporting, supervision, or discipline, and in several instances by deliberate indifference to serious medical needs of detainees.

64. First: *Jacobs v. Trochesset*, No. 3:16-CV-65, 2016 U.S. Dist. LEXIS 152111 (S.D. Tex., Galveston Division, Nov. 2, 2016, Judge Hanks). Jesse Clayton Jacobs, a 32-year-old pretrial detainee serving a 30-day sentence, died on March 15, 2015, after the Galveston County Jail's medical staff withheld his prescribed medication despite a physician's letter stating it was "imperative" he receive it. The Galveston County Medical Examiner determined cause of death as abrupt discontinuation of long-term Alprazolam medication. The family filed a federal civil rights lawsuit alleging the Sheriff implemented an explicit policy prohibiting administration of prescribed benzodiazepines and discouraging jail staff from calling 911 to save money. Judge George C. Hanks, Jr. – sitting in this Court and this Division – denied the Sheriff's motion to dismiss on qualified immunity grounds, finding the allegations sufficient to proceed. Galveston County was a named defendant represented by counsel in that litigation. It had actual notice through its own attorneys of the pattern of inadequate medical care at its jail as of 2016 – nearly a decade before Plaintiff Dick arrived at the same facility with visible and severe injuries requiring immediate medical attention.

65. Second: *Ledezma Perales v. Wuneburger et al.*, No. 3:22-cv-00061 (S.D. Tex., Galveston Division).  On November 29, 2020, GCSO Sgt. Jonathan Wuneburger pushed detainee Efrain Ledezma Perales to the floor of his jail cell, causing fatal head injuries.  Ledezma Perales died December 14, 2020.  A Galveston County grand jury indicted Wuneburger for manslaughter in June 2021.  Wuneburger pleaded to criminally negligent homicide and received seven years of probation in December 2023.

66. Third: *Huber v. Galveston County et al.*, No. 3:21-cv-00089 (S.D. Tex., Galveston Division).  A GCSO detention officer used a riot shield to slam a restrained detainee to the ground, struck his head against concrete, and continued applying force after he was handcuffed. The court denied the officer summary judgment on qualified immunity as to this conduct, finding genuine disputes of material fact regarding whether the force used was objectively unreasonable.

67. Fourth: *Sanyal v. Creech*, No. 3:24-cv-00325 (S.D. Tex., Galveston Division, June 9, 2025, Judge Brown).  On May 21, 2023, GCSO Deputy Jeremy Creech tased motorist Samudragupta Sanyal at a roadblock after Sanyal had exited his vehicle and was compliant with Creech's orders. The court found Sanyal sufficiently alleged that Creech's use of force was objectively unreasonable and denied Creech's motion to dismiss the excessive force claim against him individually.

68. Fifth: GCSO Event Nos. 2024-058245 and 2024-058246 (May 22, 2024).  GCSO Deputy Jacob Danesi initiated a traffic stop of Beau Alexander Pryor solely because Pryor made an obscene gesture.  Danesi's own official CAD narrative states the stop

was a "reasonable suspicion stop for obscene gesture to passing cars." No citation issued. No offense found. Disposition: NIO. Danesi detained Pryor for 24 minutes and 28 seconds, called for backup, and documented his belief that Pryor was a "sovereign citizen" for asserting his constitutional rights.

69. Sixth: *Palacios v. Galveston County, No. 3:26-cv-00152 (S.D. Tex. filed May 11, 2026)*. On September 10, 2024, GCSO jailer Skylar Ray Chapman placed his knee and lower leg on detainee Saul Vargas's neck while other officers and a VitalCore nurse stood nearby without intervening. Sgt. Andrew Hyde deployed a Taser against Vargas five times, including after Vargas had been restrained. The VitalCore nurse entered the cell while Chapman's knee remained on Vargas's neck, removed Taser barbs without assessing Vargas's condition, and left without directing Chapman to cease. Vargas was left unattended on a concrete bench for nearly twenty minutes before staff returned. The medical examiner determined cause of death as asphyxia due to neck compression and classified the manner of death as homicide. Chapman was indicted by a Galveston County grand jury for criminally negligent homicide in August 2025. VitalCore, the medical contractor also responsible for Plaintiff Dick's care on May 4, 2025, is a named defendant in the Vargas lawsuit. Vargas was one of four inmates to die in GCSO custody in 2024. Two additional inmate deaths in 2025 remain under investigation by the Texas Rangers.

70. These incidents were known to policymakers through internal reporting and use-of-force review systems, civil rights litigation filed in federal court, criminal

investigations and proceedings involving GCSO personnel, and supervisory review within the chain of command. Despite this knowledge, Galveston County failed to take adequate corrective action.

### *Failure to Train, Supervise, and Discipline*

71. Galveston County, acting through its Sheriff and supervisory personnel, failed to adequately train deputies regarding: (1) the constitutional prohibition against using force on restrained or subdued individuals; (2) the limits of force once a subject is under control; (3) the prohibition against issuing compliance commands to subjects whose compliance has been physically prevented by fellow officers and treating the resulting inability to comply as resistance; (4) the duty to accurately document uses of force; and (5) the right of citizens to engage in protected speech directed at law enforcement without suffering adverse enforcement action. The need for such training was obvious and the failure to provide it constitutes deliberate indifference. *City of Canton v. Harris*, 489 U.S. 378 (1989).

72. The training failure at issue is not that officers lacked de-escalation knowledge. Deputy Cagnon himself identified the peaceful resolution when he told Plaintiff's coworker "Yeah" and offered to bring the wallet over. The training failure is institutional: GCSO's culture permitted and tolerated force in response to verbal provocation regardless of available peaceful alternatives and regardless of whether the subject had been physically subdued. When a deputy who has just agreed to facilitate a peaceful wallet transfer can twenty-four seconds later participate in a full-force body slam of the same person – for saying "fuck you" – without

consequence, the institutional failure is self-evident.

73. Galveston County further failed to adequately supervise deputies in the field and failed to enforce meaningful discipline in response to known constitutional violations. These failures created an environment in which deputies reasonably believed that: (1) the use of excessive force against restrained individuals would not result in discipline; (2) inaccurate or incomplete reporting of force would be tolerated or ignored; and (3) the issuance of physically impossible compliance commands to create an audio record of apparent resistance carried no professional consequence.

74. GCSO's institutional culture of tolerating force against restrained and non-threatening civilians is further demonstrated by the conduct and hiring decisions of its current leadership. The Texas Commission on Law Enforcement ("TCOLE") filed a petition in June 2024 recommending revocation of Sheriff Fullen's peace officer license after finding that Fullen had submitted false or untruthful information on personal history statements submitted to two law enforcement agencies in 2023 and 2024. TCOLE's petition found that Fullen omitted and misrepresented, among other things, prior arrests, prior terminations from law enforcement employment, discrimination accusations, document tampering allegations, civil lawsuits, and court-ordered payment failures. Following Fullen's election as Sheriff in November 2024, TCOLE and Fullen reached a mediated Agreed Order, adopted by a 6-0 TCOLE vote on December 10, 2025, imposing a six-month probated suspension backdated to the period June 30 through December 31, 2024. The Agreed Order

constitutes a final agency finding that Fullen violated TCOLE standards governing honesty in official documents.

75. Upon assuming office in January 2025, Sheriff Fullen immediately appointed Joel Caldwell as GCSO Chief Deputy – the second-highest ranking position in the agency. Caldwell had resigned from the Galveston Police Department effective January 1, 2025. Prior to his appointment, Caldwell had contributed $10,000 to Fullen's election campaign and had testified on Fullen's behalf at TCOLE proceedings. Caldwell's documented record at GPD includes four formal suspensions under three different chiefs of police spanning more than twenty years; findings of falsified use-of-force reports; body-worn camera non-activation during use-of-force incidents; improper deployment of a Byrna launcher into a crowd; and unlawful arrests. Caldwell was also a named defendant in *Rebmann v. City of Galveston*, No. 3:24-cv-00155 (S.D. Tex.), a federal civil rights case alleging retaliatory force against citizen journalists. Fullen's decision to place Caldwell – an officer with a documented history of force, false reports, and missing camera footage – in the second-highest position of command sent a clear signal to GCSO deputies that such conduct carries no professional consequence within the agency.

*Ratification by Final Policymaker*

76. Following the incident involving Plaintiff, supervisory personnel within the Galveston County Sheriff's Office reviewed the use of force through official reporting channels. Defendant Cruz, acting in a supervisory capacity, reviewed and approved Defendant Cagnon's official use-of-force supplement on May 7, 2025 at

11:34 p.m. – three days after the incident. That supplement expressly acknowledges that Cagnon delivered "two closed fist strikes to Ethan's face" which "provided positive results" after Plaintiff had been "taken to the ground." Cruz reviewed and approved this supplement without recommending any discipline, investigation, or further review.

77. This approval of clearly unconstitutional conduct – based on facts documented within the agency's own reporting system – constitutes ratification of the use of excessive force.

78. Sheriff Fullen, as the duly elected final policymaker for GCSO law enforcement operations, had actual or constructive knowledge of this incident and the manner in which it was documented and approved, yet took no corrective action, initiated no discipline, and ordered no further review. This command-level acquiescence in clearly documented unconstitutional conduct constitutes ratification by the final policymaker and is directly attributable to Galveston County as official policy. *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988); *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985).

79. No meaningful investigation, discipline, or corrective action followed the incident. Because the Sheriff is the final policymaker for law enforcement operations, the ratification of this use of force through the chain of command is attributable to Galveston County and represents official policy.

**Moving Force**

80. The policies, customs, practices, failures to train, failures to supervise, and

ratification described herein were the moving force behind the constitutional violations suffered by Plaintiff. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

81. But for these systemic failures and the County's deliberate indifference to known patterns of excessive force against restrained or non-resisting individuals, the unlawful conduct described herein would not have occurred. The need for proper training, supervision, and discipline regarding the use of force against restrained or subdued individuals, the prohibition against manufactured resistance narratives through physically impossible compliance commands, and the accurate documentation of force incidents was obvious. The failure to provide such safeguards made the constitutional violations suffered by Plaintiff highly predictable.

## IX.   CLAIMS FOR RELIEF

**CLAIM ONE – Fourth Amendment – Excessive Force and Failure to Intervene**
*(42 U.S.C. §1983 – Against Individual Defendants Savage, Cagnon, Mejia, and Cruz)*

82. Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

83. The Fourth Amendment protects individuals from unreasonable seizures, including the use of excessive force by law enforcement officers during an arrest.

84. Defendants Savage, Cagnon, and Mejia used force against Plaintiff that was objectively unreasonable in light of the facts and circumstances confronting them. Plaintiff was unarmed and did not pose an immediate threat. Plaintiff did not

attempt to flee.  The officers themselves had acknowledged his innocent purpose moments before applying force.  Plaintiff's last two audible acts before being lifted off the ground were a verbal explanation of innocent conduct ("I was just askin' man") and a word of compliance ("Alright").  The complete twenty-four-second temporal arc of the encounter contains no physical threat, no weapon, and no conduct that objectively justified a full-force body slam onto concrete.  *Barnes v. Felix*, 605 U.S. 73 (2025).

85.    Defendant Savage's decision to escalate from arm restraint to a body-wrap takedown was made at a moment when Plaintiff was standing, controlled, and had not engaged in any new act of resistance.  This escalation decision was independently unconstitutional.  Savage's completion of a full-force body slam – with sufficient force to raise Plaintiff's feet above his own head height, driving him face-first onto concrete – after hearing Plaintiff audibly comply constitutes an independently unconstitutional use of excessive force.  No reasonable officer could conclude that this was objectively reasonable.

86.    While Plaintiff was restrained and on the ground, Defendant Cagnon struck Plaintiff in the face with closed fists after Plaintiff had already been forced to the ground and was incapable of resistance, as confirmed by Cagnon's own official supplement report.  This Court denied a motion to dismiss on comparable facts in *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 834 (S.D. Tex. 2011).  The post-subdual strikes against Plaintiff are legally indistinguishable.

87.    Defendant Mejia issued compliance commands to Plaintiff while Plaintiff's arms

were being physically restrained by Savage and Cagnon, in Mejia's direct line of sight – confirming that the commands were physically impossible to comply with. Mejia had a reasonable opportunity to intervene by directing verbal commands to his fellow officers but failed to do so.  Defendant Mejia's failure to intervene constitutes an independent basis for liability.  *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).

88.    Defendant Cruz served as the on-scene supervisor and reporting officer.  Three days after the incident, Cruz reviewed and approved Cagnon's official use-of-force supplement – a supplement that explicitly admits Cagnon delivered two closed-fist strikes to Plaintiff's face after Plaintiff had been "taken to the ground" – without recommending any discipline, investigation, or further review.  Cruz is named in Claim One in his capacity as a supervisory ratifier of the unconstitutional force.

89.    As a direct and proximate result of Defendants' actions, Plaintiff suffered physical injuries including broken teeth, a concussion, facial trauma, a sprained wrist, a sprained shoulder, and a lacerated lip requiring stitches, as well as pain, mental anguish, emotional distress, medical expenses, and other damages.  The actions of Defendants Savage, Cagnon, and Mejia were intentional, malicious, and undertaken with reckless disregard and callous indifference for Plaintiff's constitutional rights, warranting an award of punitive damages against each in their individual capacities. Plaintiff is entitled to recover compensatory damages, punitive damages, and all other relief available under 42 U.S.C. §1983.

## CLAIM TWO – Municipal Liability
*(42 U.S.C. §1983 – Monell – Against Defendant Galveston County)*

90.   Plaintiff repeats, realleges, and incorporates by reference all preceding paragraphs, including Section VIII of this Complaint, as if fully set forth herein.

91.   Defendant Galveston County is liable under 42 U.S.C. §1983 for the constitutional violations suffered by Plaintiff, which were caused by the official policies, customs, practices, ratification, and deliberate indifference of Galveston County and its final policymaker. Specifically, Galveston County's municipal liability arises from: (1) a pattern of materially similar constitutional violations known to policymakers, including the use of force against restrained or subdued individuals, as documented in the prior incidents described above; (2) a failure to adequately train deputies on the constitutional limits of force against restrained or subdued persons, see *City of Canton v. Harris*, 489 U.S. 378 (1989), including a failure to train on the prohibition against issuing compliance commands that are physically impossible to obey and then treating the resulting non-compliance as resistance justifying force; (3) ratification of the unconstitutional force through the chain of command – from Defendant Cruz's approval of the Cagnon supplement to Sheriff Fullen's knowing inaction as final policymaker – see *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988); *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985); and (4) deliberate indifference to known patterns of excessive force and inadequate reporting through the failure to discipline or correct. These municipal failures were the moving force behind the constitutional violations suffered by

Plaintiff. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001); *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).

92.    Plaintiff is entitled to recover compensatory damages and all other relief available under 42 U.S.C. §1983.

**CLAIM THREE – Assault and Battery – Pled in the Alternative**
*(Texas State Law Claim – Against Defendants Savage and Cagnon – Fed. R. Civ. P. 8(d)(2))*

93.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.  This claim is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2).

94.    Under Texas law, a person commits assault if they intentionally or knowingly cause bodily injury to another, or intentionally or knowingly cause physical contact that the actor knows or should reasonably believe the other will regard as offensive or provocative.  Tex. Penal Code §22.01.

95.    Defendants Savage and Cagnon intentionally and knowingly made harmful and offensive physical contact with Plaintiff.  The physical force used against Plaintiff was excessive, unreasonable, and unnecessary under the circumstances.

96.    As a direct and proximate result of this conduct, Plaintiff suffered bodily injury and other compensable damages, including physical injury, pain and suffering, mental anguish, emotional distress, and medical expenses.

97.    The use of force by Defendants Savage and Cagnon was not justified or privileged under Texas law.  Texas official immunity does not shield these Defendants because

their conduct was objectively unreasonable and therefore falls outside the protection of good-faith official immunity. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 656 (Tex. 1994). No reasonably prudent officer could have believed that lifting a verbally compliant, physically controlled individual with sufficient force to raise his feet above his head height, driving him face-first onto concrete, and then delivering closed-fist strikes to his face while he lay prone and restrained, was constitutionally or legally justified.

## CLAIM FOUR – First Amendment Retaliation
*(42 U.S.C. §1983 – Against Defendants Savage and Cagnon)*

98.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

99.    The First Amendment protects the right to engage in expressive conduct, including verbal criticism of and profanity directed at law enforcement officers. *Houston v. Hill*, 482 U.S. 451, 461 (1987); *Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002) (holding that adverse governmental action taken in retaliation for protected speech, including criticism of public officials, violates the First Amendment). The fighting-words exception does not apply to verbal criticism directed at law enforcement officers, who are trained and constitutionally required to exercise greater restraint in response to verbal provocation. *Houston v. Hill*, 482 U.S. at 461.

100.    Plaintiff's verbal expression – "Hey fuck you man" – directed at Defendant Savage constituted protected speech under the First Amendment. This expression was a vocal challenge to law enforcement authority uttered by a man who had just been

told to stay back from a task he had an innocent reason to perform and which the officer himself had just agreed to facilitate. It carried no element of a true threat or fighting words sufficient to strip it of constitutional protection.

101. A plaintiff asserting First Amendment retaliation must show: (1) he was engaged in constitutionally protected activity; (2) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse actions were substantially motivated against the plaintiff's exercise of constitutionally protected conduct. *Keenan v. Tejeda*, 290 F.3d at 258. All three elements are met here. Plaintiff engaged in protected speech. Defendants' immediate use of violent force – a body slam with sufficient force to raise Plaintiff's feet above his head height, followed by closed-fist strikes – would chill any person of ordinary firmness from criticizing law enforcement. The instantaneous temporal sequence between Plaintiff's protected speech and the force, combined with the absence of any intervening physical threat, demonstrates that Plaintiff's speech was the direct motivating cause of the force. Three body-worn cameras captured this sequence. No physical threat occurred between Plaintiff's protected speech and the body slam – only a man approaching to retrieve a wallet, whose innocent purpose the officers had acknowledged moments before.

102. Plaintiff's nolo contendere plea to Tex. Penal Code §38.03(a) does not bar this First Amendment retaliation claim. The retaliation claim is premised on Plaintiff's protected speech as the triggering event for the force, not on any physical conduct.

The §38.03 conviction does not specify that Plaintiff's verbal expression was the basis for any finding, and a successful First Amendment retaliation claim would not imply the invalidity of the conviction.

103. This claim is further not defeated by *Nieves v. Bartlett*, 587 U.S. 391 (2019). *Nieves* held that the presence of probable cause generally bars a First Amendment retaliatory *arrest* claim, subject to a narrow exception. *Gonzalez v. Trevino*, 602 U.S. 653 (2024). The retaliation at issue here was not the arrest itself but the immediate use of physical force in direct response to Plaintiff's protected speech – a body slam and closed-fist strikes – before any arrest was effected. *Nieves* addressed only the arrest context and did not purport to resolve whether its probable-cause framework extends to retaliatory force claims; that question remains unresolved. Plaintiff's claim, which challenges the force used rather than the decision to arrest, is governed by the ordinary First Amendment retaliation framework set forth above.

104. As a direct and proximate result of Defendants Savage's and Cagnon's First Amendment retaliation, Plaintiff suffered the injuries and damages described herein.  The actions of Defendants Savage and Cagnon were intentional, malicious, and undertaken with reckless disregard and callous indifference to Plaintiff's constitutional rights.  Plaintiff is entitled to recover compensatory damages, punitive damages, and all other relief available under 42 U.S.C. §1983 and 42 U.S.C. §1988.

**CLAIM FIVE – Fourteenth Amendment – Denial of Medical Care (Pretrial Detainee)**
*(42 U.S.C. §1983 – Against Defendant Galveston County)*

105. Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

106. As a pretrial detainee, Plaintiff's right to adequate medical care is protected by the Fourteenth Amendment's Due Process Clause. The Fifth Circuit applies an objective standard to a pretrial detainee's medical care claim: whether the defendant's response to the detainee's medical need was objectively unreasonable in light of the facts and circumstances confronting the defendant, regardless of the defendant's subjective awareness. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) (objective standard governs pretrial detainee claims under the Fourteenth Amendment); *Cope v. Cogdill*, 3 F.4th 198 (5th Cir. 2021).

107. Following the incident, Plaintiff was transported to the Galveston County Jail while visibly injured, bleeding from the face, with a tooth knocked from his mouth and a hole in his lip. Plaintiff's injuries were severe and plainly apparent upon observation. The jail nurse on duty refused to process Plaintiff into the jail because Plaintiff's injuries were too severe for standard intake procedures – a contemporaneous third-party determination of the seriousness of Plaintiff's injuries. Plaintiff was then transported to an outside medical facility.

108. At the outside medical facility, Plaintiff received stitches for the hole in his lip. The stitches were administered without adequate anesthetic, without informed consent, and without basic sanitation protocols. Plaintiff experienced significant pain and

suffering as a result of the inadequate medical procedures.

109.    Galveston County, acting through its jail personnel and medical staff, demonstrated objective deliberate indifference to Plaintiff's serious medical need.  The failure to provide prompt, adequate, and sanitary medical care to a detainee with visible and severe facial injuries constitutes an objectively unreasonable response to a serious medical need in violation of the Fourteenth Amendment.

110.    Galveston County's deliberate indifference to the medical needs of its detainees is not an isolated failure.  It reflects a documented institutional pattern spanning more than a decade.  In 2015 – and again in 2016 when this Court denied a motion to dismiss on qualified immunity grounds in *Jacobs v. Trochesset*, No. 3:16-CV-65 (S.D. Tex. Nov. 2, 2016) – Galveston County Jail medical staff withheld prescribed medication from a detainee with a documented medical need, resulting in his death. Galveston County was a named defendant represented by counsel in that litigation. The Galveston County Jail was also cited in that litigation for lacking an infirmary unit required by the Texas Administrative Code and for failing a subsequent Texas Commission on Jail Standards inspection.  Additional detainee deaths attributed to inadequate medical care at Galveston County facilities were documented in 2016, 2017, and 2018.  In 2024, Saul Vargas died after VitalCore – the same medical contractor responsible for Plaintiff Dick's care on May 4, 2025 – failed to assess or treat him during and after a force incident in which a jailer's knee remained on his neck while the nurse removed Taser barbs.  The persistence of inadequate medical care at the Galveston County Jail across multiple contractors over more than a

decade demonstrates that the constitutional deficiency is institutional, not contractual: it is the County's own policies, oversight failures, and deliberate indifference that has produced this unbroken pattern of harm. *City of Canton v. Harris*, 489 U.S. 378 (1989); *Dyer v. Houston*, 964 F.3d 374 (5th Cir. 2020); *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).

111. As a direct and proximate result of Defendant Galveston County's deliberate indifference to Plaintiff's serious medical need, Plaintiff suffered additional pain, unnecessary medical complications, and other compensable damages. Plaintiff is entitled to recover compensatory damages and all other relief available under 42 U.S.C. §1983.

## X.   DAMAGES

112. Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

113. As a direct and proximate result of Defendants' actions, Plaintiff suffered past and future physical pain and suffering; past and future mental anguish and emotional distress; past medical expenses; future medical expenses, including ongoing dental treatment for the tooth knocked from his mouth, damage to adjacent teeth, dental implants, crowns, and related restorative care; permanent physical injury and disfigurement; loss of enjoyment of life; past and future lost wages and impaired earning capacity; and other compensable damages in amounts to be determined by the jury.

114. Plaintiff seeks recovery of compensatory damages, including past and future

medical expenses, future lost wages and impaired earning capacity, future pain and suffering, permanent injury and disfigurement, and loss of enjoyment of life, in an amount to be determined by the jury.

115. Plaintiff further seeks punitive damages against the individual Defendants in their individual capacities for their intentional, reckless, and callous disregard for and deliberate indifference to Plaintiff's constitutional rights.

116. Plaintiff also seeks recovery of reasonable attorney's fees and costs pursuant to 42 U.S.C. §1988.

## XI.    PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED, Plaintiff Ethan Carl Dick** respectfully requests that Defendants be cited to appear and answer and that upon final trial, Plaintiff recover judgment against Defendants for:

- Compensatory damages, including past and future medical expenses, future lost wages and impaired earning capacity, future pain and suffering, permanent injury and disfigurement, and loss of enjoyment of life, in an amount to be determined by the jury;

- Punitive damages against the individual Defendants in their individual capacities;

- Reasonable attorney's fees and costs pursuant to 42 U.S.C. §1988;

- Pre-judgment and post-judgment interest as allowed by law; and

- Such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Plaintiff requests all relief to which he is entitled under federal and Texas law.

## XII.    <u>JURY DEMAND</u>

Plaintiff demands trial by jury on all issues so triable.

Date:  <u>06/19/2026</u>                    Respectfully submitted,


<u>/s/Courtney A. Vincent</u>                  <u>/s/ Adalberto E. Ruiz</u>
**Courtney A. Vincent**                   **Adalberto E. Ruiz**
Minnesota Bar No. 0403083          Texas Bar No. 24071767
SDTX Bar No. 3746531               SDTX Bar No. 2925292
**info@vincentlawpllc.com**            **alberto@ruizlawyer.com**
*Vincent Civil Rights –*               *Ruiz Law Firm, PLLC*
*a Division of Vincent Law, PLLC*       3718 E. Broadway Street
1035 Dairy Ashford, Suite 145      Pearland, Texas 77581
Houston, Texas  77079              Tel: (713) 234-7894
**Mailing Address:**                   Fax: (832) 408-8540
P.O. Box 940129                    **CO-COUNSEL FOR PLAINTIFF**
Houston, Texas  77094
Tel: (713)223-9300
Fax: (832)603-4444
**COUNSEL FOR PLAINTIFF**